UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | MC 25-0028-GW-SSx | Date | May 16, 2025 |
|---|---|---|---|
| Title | *In Re Subpoena to Warner Brothers Entertainment Inc.* | | |

| Present: The Honorable | GEORGE H. WU, UNITED STATES DISTRICT JUDGE | |
|---|---|---|
| Javier Gonzalez | None Present | |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| None Present | None Present |

**PROCEEDINGS:** IN CHAMBERS - TENTATIVE RULING ON PETITIONER ERIC LYLE WILLIAMS' MOTION TO COMPEL COMPLIANCE WITH SUBPOENA SERVED ON THIRD-PARTY WARNER BROTHERS ENTERTAINMENT, INC. [1]

Attached hereto is the Court's Tentative Ruling on Petitioner's Motion [1] set for hearing on May 22, 2025 at 8:30 a.m.

:

Initials of Preparer    JG

***In re Subpoena to Warner Bros. Entm't, Inc. (Williams v. Guerrero)***, Case No./ 2:25-mc-00028-GW (SSCx); Tentative Ruling on Petitioner's Motion to Compel Compliance with Subpoena Served on Third-Party Warner Brothers Entertainment, Inc.

At issue here is application of a qualified First Amendment privilege that operates foremost in a news-gathering/reporting setting. In connection with a federal capital habeas petition he is pursuing in the Northern District of Texas (*see* Declaration of Amy P. Knight in Support of Petitioner Eric Lyle Williams's Motion to Compel Compliance with Subpoena Served on Non-Party Warner Brothers Entertainment, Inc. ("Knight Decl."), Docket No. 2-1, ¶ 2 & Exh. A), petitioner Eric Lyle Williams ("Petitioner") successfully persuaded that court to issue a subpoena directed at non-party Warner Brothers Entertainment, Inc. ("Warner") in California. *See id.*, ¶ 5 & Exh. D. In connection with that subpoena, Petitioner currently[1] seeks to have Warner produce all footage and transcripts (if any) of interviews conducted of three individuals – Bill Wirskye ("Wirskye"), Erleigh Wiley ("Wiley"), and Jenny Parks ("Parks")[2] – in connection with an episode of Warner's *Crime Watch Daily* program released in 2020 (some six years after Petitioner's *trial*, though obviously post-trial proceedings continue). Warner objected to the subpoena, *see* Knight Decl., ¶ 7 & Exh. F (located at pgs. 236-240 of 424), and Petitioner has consequently filed, in this Court, a motion to compel

---

[1] In addition to footage concerning an episode of a different program that is not the subject of the current motion to compel, Petitioner originally sought the following in its subpoena to Warner:

> All footage of interviews recorded in the production of 2020 Crime Watch Daily episode "Disbarred former judge exacts brutal revenge on Texas prosecutors," including those that were not included in the final episode, complete and unedited, and any existing transcripts of those interviews, including but not limited to interviews with:
> Jenny Parks
> Erleigh Wiley
> JR McLelland
> Krista Ball
> Bill Wirskye.

*See* Knight Decl., ¶ 6 & Exh. E (located at pg. 233 of 424). Petitioner no longer seeks material related to JR McLelland and Krista Ball. *See* Docket No. 2, at 8:13-19, 14:1-2.

[2] Petitioner describes Wirskye as "the lead trial prosecutor," Wiley as "an important witness who testified for the prosecution," and Park as "another important witness who testified for the defense." Docket No. 2, at 3:27-4:4; *see also id.* at 8:20-9:1.

1

compliance with the subpoena.³

In order to permit Petitioner's subpoena to Warner, the Texas federal district court handling Petitioner's habeas petition must have determined – over opposition from the State of Texas, *see* Knight Decl., ¶ 4 & Exh. C, not Warner (who was not heard on the matter⁴) – that there was "good cause" to authorize the discovery, as required by Rule 6 of the Rules Governing § 2254 Proceedings. That court determined that Petitioner "has alleged facts which make a rational case for his belief that relevant and material information may be in the possession of the media organizations in question and within the personal knowledge of the individuals interviewed and recorded by the media organizations." *See id.*, ¶ 5 & Exh. D.

The primary issue here on this motion is whether Warner enjoys a qualified First Amendment privilege that prevents it from having to comply with Petitioner's subpoena. *See generally Farr v. Pitchess*, 522 F.2d 464, 467-68 (9th Cir. 1975).⁵ The "good cause" standard the Texas federal court necessarily must have considered in approving of the subpoena's issuance is not the same as the qualified privilege recognized by the Ninth Circuit, and does not resolve the questions/issues presented by that privilege.

In the Ninth Circuit, an individual seeking information protected by that privilege has the burden "to demonstrate a sufficiently compelling need for the journalist's

---

³ A different subpoena, issued to NBC Universal Media, LLC, is currently the subject of a similar action – filed over three weeks before the instant proceeding – in the Southern District of New York. This Court is unaware of whether that action has reached its culmination yet, or whether any hearings or other proceedings have taken place. Whatever becomes of that matter, the Court has no reason to conclude that the New York federal court will be applying Ninth Circuit law on this topic.

⁴ Warner notes that the Fifth Circuit does not recognize the privilege at issue here (at least outside the protection of confidential source information), one that *is* recognized by the Ninth Circuit, as explained *infra*. *See United States v. Smith*, 135 F.3d 963, 970 n.2 (5th Cir. 1998) (pointing to the Ninth Circuit's decision in *Shoen v. Shoen*, 5 F.3d 1289, 1296 (9th Cir. 1993) in contrast). Both because of this fact and because, as noted *infra*, the "good cause" standard facing the Texas federal habeas court differs from the qualified privilege test now before this Court (most-notably, for present purposes, given the exhaustion requirement applicable to the latter), the issues this Court confronts were not before the Texas federal habeas court, which had no obvious reason to consider them.

⁵ Although *Farr* was issued in the context of confidential-source protection, the Ninth Circuit later explained that "the privilege protects a journalist's resource materials regardless of whether these materials contain confidential information." *Shoen v. Shoen*, 5 F.3d 1289, 1294 (9th Cir. 1993). However, "the absence of confidentiality may be considered in the balance of competing interests as a factor that diminishes the journalist's, and the public's, interest in non-disclosure." *Id.* at 1295.

materials to overcome the privilege." *Shoen v. Shoen*, 5 F.3d 1289, 1296 (9th Cir. 1993) ("*Shoen I*").[6]  This is in part in recognition of the Circuit's conclusion that "routine court-compelled disclosure of research materials poses a serious threat to the vitality of the newsgathering process." *Shoen v. Shoen*, 48 F.3d 412, 416 (9th Cir. 1995) ("*Shoen II*"). "At a minimum," the burden faced by an information-seeker "requires a showing that the information sought is not obtainable from another source." *Shoen I*, 5 F.3d at 1296.  This showing requires that "the requesting party . . . demonstrate that [he] has exhausted all reasonable alternative means for obtaining the information." *Id.*; *see also id.* at 1297 ("As the court noted in *Carey v. Hume*, 492 F.2d 631 (D.C. Cir. 1974), compelled disclosure from a journalist must be a 'last resort after pursuit of other opportunities has failed.'") (quoting *Carey*, 492 F.2d at 639) (omitting subsequent history citation).

Once an individual seeking to overcome the privilege has satisfactorily demonstrated exhaustion, a court must conduct a "'judicial[] weigh[ing] in light of the surrounding facts, and a balance struck to determine where lies the paramount interest.'" *Shoen I*, 5 F.3d at 1292-93 (quoting *Farr*, 522 F.2d at 468).  As part of that weighing, the requesting party must show that the requested material is – in addition to being

---

[6] The Court does not see room in Ninth Circuit precedent on this question for a conclusion, advanced by Petitioner, that Warner's *Crime Watch Daily* program falls *outside* the bounds of the qualified privilege as a purely "'true crime' entertainment program" and not at all a "news" operation.  The *Schoen* litigation involved a book author writing a book about the founder of the U-Haul Company that included as a topic therein the murder of one of the founder's family members.  The Court sees little distinction between that book author and Warner's *Crime Watch Daily* episode.  While *Schoen I* left open the possibility that the qualified privilege might not be able to be invoked by "a person writing a book about a recent historical figure, such as Harry Truman or Albert Einstein, where the intent, arguably, is not the dissemination of 'news,' but the writing of history," *Schoen I*, 5 F.3d at 1294 n.9, Warner clearly does not fall closer to that end of the spectrum than to the book author in *Schoen*, even though the events underlying Petitioner's prosecution happened several years before Warner aired its program.  Petitioner cites several Second Circuit decisions in support of his argument, but the Court sees no foothold in this Circuit for his position on this point with respect to the *Crime Watch Daily* program.  In any event, as Warner notes in its argument, in each of the cited cases the court actually applied the privilege (as opposed to rejecting its applicability because of the nature of the underlying activity), even if it did not always result in protection of the material in question.  *See Gonzales v. Nat'l Broad. Co., Inc.*, 194 F.3d 29, 32-36 (2d Cir. 1999); *In re Application to Quash Subpoena to Nat'l Broad. Co., Inc.*, 79 F.3d 346, 351 (2d Cir. 1996); *Baker v. F&F Inv.*, 470 F.2d 778, 781-82 (2d Cir. 1972).

　　Petitioner also argues that, even if *Crime Watch Daily* can enjoy *some* measure of protection by the privilege, "the societal interest in protecting the materials is significantly weaker than in traditional investigative contexts."  Docket No. 2, at 15:14-17.  Notwithstanding the foregoing discussion in this footnote, the Court does not necessarily disagree with Petitioner that the nature of a "journalistic" enterprise can be taken into consideration in the "judicial weighing" – discussed *infra* – that the Court would ultimately undertake (once exhaustion is shown).

unavailable despite sufficient exhaustion – both "noncumulative" and "clearly relevant to an important issue in the case," meaning "a showing of actual relevance," not "potential relevance." *Shoen II*, 48 F.3d at 416.

      Before proceeding to an analysis of the applicable test, the Court addresses Petitioner's suggestion that, because this proceeding is related to an earlier criminal case, and because he has been sentenced to death, the Court's considerations should be something other than as announced in the *Shoen* litigation. Petitioner argues that the *Shoen II* requirements "should apply less stringently when the person seeking the materials is a criminal defendant." Docket No. 2, at 16:16-19. In support of that view, Petitioner asserts that there is "no Ninth Circuit law on the application of a journalist's privilege in a criminal case," Docket No. 2, at 16:5-7, and that at least some lower courts "have . . . recognized that the interests favoring disclosure tend to be weightier in criminal matters." *Id.* at 16:12-13. Of course, as Warner points out, a habeas matter is a *civil* proceeding. Petitioner has not identified any authority, or even any particular reason (aside from the potentially-weighty consideration that, subject to a death sentence in Texas, his life is on the line), why a habeas matter should be analyzed under a test that differs from that which was established in *Schoen II*. He certainly does not propose an alternative, workable, test.

      Petitioner is obviously correct that this case is situated differently than the *Shoen* litigation (which involved an underlying civil defamation lawsuit), or any case addressing the qualified First Amendment privilege in a normal civil discovery-setting. *Shoen II* set forth the test for overcoming the journalist's privilege in that civil context. *See Shoen II*, 48 F.3d at 416 ("We therefore hold that where information sought is not confidential, a civil litigant is entitled to requested discovery notwithstanding a valid assertion of the journalist's privilege by a nonparty only upon a showing that the requested material is . . . ."); *id.* at 418; *see also id.* at 416 ("As the District of Columbia Circuit has observed, 'in the ordinary case the *civil* litigant's interest in disclosure should yield to the journalist's privilege. Indeed, if the privilege does not prevail in all but the most exceptional cases, its value will be substantially diminished.'") (quoting *Zerilli v. Smith*, 656 F.2d 705, 712 (D.C. Cir. 1981)) (emphasis added). However, the Ninth Circuit has explained that the privilege applies in criminal cases as well. *See Farr*, 522 F.2d at 467 (involving refusal

to divulge sources in context of underlying Manson Family criminal trial, noting that Supreme Court cases recognizing the privilege "appear[] to teach broadly enough to be applied to . . . criminal judicial proceedings"); *see also Shoen I*, 5 F.3d at 1292 ("We held in *Farr* that the journalist's privilege recognized in *Branzburg* [*v. Hayes*, 408 U.S. 665 (1972)] was a 'partial First Amendment shield' that protects journalists against compelled disclosure in all judicial proceedings, civil *and criminal* alike.") (emphasis added).

In staking his position on this point, Petitioner directs the Court to *United States v. Newland*, No. 17CR0623-JLS, 2021 WL 6051675 (S.D. Cal. Dec. 21, 2021). That matter, however, involved a pursuit of discovery in the weeks *leading up to* the beginning of a criminal trial. In any event, even in that case, the district court never concluded that some more-lenient test (from Petitioner's perspective) would apply in the actual criminal matter at hand. *See id.* at *2 (noting that "the precise legal standard applicable to the production of non-confidential material from a news organization for use in a criminal case is a subject of debate between the parties" and then concluding that even under "the more stringent test" – the test announced in *Shoen II* – the subpoena in question was enforceable). In any event, again, as Warner has pointed out, even if Petitioner was correct about application of the privilege in criminal cases, this is not a subpoena in a criminal case. The criminal case concerning Petitioner is complete. This is a habeas matter.

Once beyond that issue, at this point in time Petitioner has the same exhaustion problem that, in *Shoen I*, prevented compelled compliance with the discovery-pursuit. In the *Shoen* litigation, the Ninth Circuit initially concluded that the individuals seeking the information in question did not satisfy their "exhaustion" requirement because they did not take the deposition of the individual who was the subject of the investigative/interview efforts of the journalist in question, an individual who the Ninth Circuit considered "an obvious alternative source" for the sought-after information. *See Shoen I*, 5 F.3d at 1296. Here, with respect to exhaustion, after noting that the three individuals (one of whom was a witness for the defense at trial) in question already testified and were subject to examination by Petitioner's counsel, Warner argues that "Petitioner does not mention whether he even sought to re-examine them as part of the current proceeding, or what other efforts he has made to adduce evidence to support his

5

habeas petition." Docket No. 2, at 12:28-13:4 & n.7. While Petitioner correctly recognizes that, in a habeas case, he "is not entitled to subpoena witnesses and depose whomever he likes" and "may conduct discovery only with specific authorization from the Court," *Id.* at 22:4-8, he approached the federal court handling his petition to obtain the instant subpoena, but does not appear to have even attempted to do so with respect to deposing Wirskye, Wiley and Parks, an attempt that, if successful, would avoid any possibility of a qualified litigation privilege objection.

On this point, Petitioner again directs the Court to *Newland*. In that case, the district court: concluded that the information was not obtainable from the interview subject himself because, in a criminal case where that individual was himself alleged to be a coconspirator (though unnamed in the indictment at-issue), the individual was not available for a deposition; explained that "recorded verbatim statements are, by their nature, . . . not obtainable from any other source;" noted that some of the individual's published statements appeared to call into question his veracity; and determined that it had "no confidence that statements made by [the individual] to the reporter would be capable of being fully preserved by questioning [the individual] a second time." *Newland*, 2021 WL 6051675, at *3 (omitting internal quotation marks and bracketing). As a general reaction to the use of *Newland* on this point, there is no indication that the type of time pressures that would have had to be considered in the run-up to an advancing criminal trial date – with trial set to begin less than seven weeks from the date of the issuance of the order on the motion to quash – have any correlation to the situation here. This Court is not aware of any execution date having been set in connection with Petitioner's sentence.

For its part, Warner directs the Court to *Jimenez v. City of Chicago*, 733 F.Supp.2d 1268 (N.D. Ill. 2010). That case involved a subpoena issued to a journalist in the context of a civil case brought by an individual who had earlier been convicted of a crime but then had that conviction reversed and subsequently sued the defendants in the civil action. *See id.* at 1270. In that setting, the Illinois federal court found reason to apply the Ninth Circuit's *Shoen* precedent, and proceeded from there.

In contrast with *Newland*, the court handling the *Jimenez* subpoena concluded that the parties seeking the information in question had not satisfied the exhaustion

6

requirement where they had not deposed the plaintiff/interview subject, but instead had undertaken, as "their first recourse . . . to extract the communication records directly from" the journalist. 733 F.Supp.2d at 1272. The court rejected the contention that the subpoenaing parties had a need for the "specific wording" in the documents in question themselves because they "never explain[ed] the importance of the 'specific wording' other than to speculate that Plaintiff would, due to the time elapsed since his dialogue with [the journalist], be unable to recall the communications if deposed." *Id.* The court concluded that "[r]equesters may not skirt the exhaustion requirement by speculating about the alternative source's ability to fulfill their needs." *Id.*

*Jimenez* is consistent with the Ninth Circuit's approach in *Shoen I*. There, the Circuit ruled that a person seeking to pierce the qualified privilege could not, in an analogous argument, "avoid the exhaustion requirement by speculating, without supporting evidence, that [the book author's interview subject's] advanced age may have dulled his facilities." *See also Shoen I*, 5 F.3d at 1297. To shore-up that reasoning, the Ninth Circuit continued: "As the court noted in *Carey v. Hume*, 492 F.2d 631, compelled disclosure from a journalist must be a 'last resort after pursuit of other opportunities has failed.'" *Id.* (quoting *Carey*, 492 F.2d at 639).

Petitioner's exhaustion showing here is essentially non-existent, with the simple hope that the Court will take the same approach to the issue as the *Newland* court did in the context of a quickly-approaching criminal trial and an interviewee who faced potential criminal exposure of his own. Petitioner contends that "[t]here is simply no source [for the fact that a witness has said something different than what they have said in the past] other than the recordings themselves." Docket No. 2, at 21:16-19. But this is both obviously wrong and beside the point. There is no reason why Petitioner could not at least attempt to get the information he seeks from Wirskye, Wiley and Parks before resorting to subpoenaing journalistic materials. The Ninth Circuit has taken the position that breaching a journalist's qualified privilege is a "last resort." *Shoen I*, 5 F.3d at 1297. In addition, as explained, the situation in *Newland* is not on-all-fours with this case. Preliminary to that, however, it does not appear to the Court – based upon Petitioner's reasoning for why the material he seeks is relevant and worth getting, an issue more-generally considered post-exhaustion under the test set forth in *Shoen II* – that any of the

7

three witnesses has said "something different than what they have said in the past."

The Court will not take *Newland*'s approach to the exhaustion question. As such, at this point in time, Warner has convinced the Court that the qualified privilege applies and Petitioner has not cleared even the initial hurdle necessary for this Court to sanction his piercing of it.

The Court will deny Petitioner's motion to compel compliance with the subpoena directed to Warner. There is no need (at least at this time) for the Court to consider the other issues and arguments relevant under *Shoen II* or Warner's contention that compliance with the subpoena would qualify as an "undue burden" under Federal Rule of Civil Procedure 45(d)(1).